STATE of Iowa, Appellee,

v.

Deon Monterill GRAVES, Appellant.

No. 02–0358.

Supreme Court of Iowa.

Sept. 4, 2003.

Linda Del Gallo, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, and Charles A. Stream, County Attorney, for appellee.

TERNUS, Justice.

The defendant, Deon Graves, claims he received ineffective representation by his attorney in Graves' prosecution for manufacturing and possessing marijuana. Graves asserts his counsel should have objected when the prosecutor asked the defendant whether a police officer had fabricated the incriminating statements the officer testified the defendant had made upon his arrest. Graves also contends his attorney should have objected during closing arguments when the prosecutor repeatedly accused Graves of lying.

We conclude the prosecutor engaged in prejudicial misconduct and Graves' trial counsel rendered ineffective assistance by failing to object. Because the probability of a different outcome had defense counsel appropriately challenged the prosecutor's actions is sufficient to undermine our confidence in the outcome of the trial, we hold the defendant has established prejudice. Therefore, we reverse the defendant's conviction and remand for a new trial.

I. *Background Facts and Proceedings.*

On October 6, 2001, Officer Jason Steil of the Oskaloosa police department arrested Graves for driving while his license was under suspension. Another officer transported Graves to the police station. Meanwhile, the owner of the vehicle, Remos Quick, consented to Officer Steil's search of the trunk, where the officer found a dried up marijuana leaf and marijuana seeds. Quick then consented to the officer's search of Quick's residence, which he allegedly shared with Graves. Contraband found at this house led to criminal charges against Graves for manufacturing marijuana and possession of marijuana with intent to deliver, including a sentencing enhancement based on second-offender status.

See Iowa Code §§ 124.401(1)(d), .411(1) (2001).

At trial, the dispute centered on Graves' connection to a shoebox containing nearly an ounce of marijuana found in the living room and to a drying marijuana plant located in the basement. The State sought to establish a link between these items and Graves, primarily through the testimony of Officer Steil, the State's only witness in its case in chief. Steil testified that after he found this contraband during a consent search of the residence, he went to the jail to obtain Graves' permission to search a room in the house that Quick had identified as Graves' bedroom. According to Steil, when he asked the defendant about the marijuana in the basement, the defendant told Steil

> that him and Mr. Quick had found a marijuana plant outside of Oskaloosa in a ditch, and they took that plant and put it in the trunk, brought it back to their residence and tied all of the branches together and put it down in the basement so it could dry.

Steil also said the defendant told him that he had lived with Quick for about a month and that he occupied the bedroom that had previously been identified by Quick. The officer testified that Graves then consented to Steil's search of his bedroom, if Graves could go along.

Steil told the jury that on their way to the house, Graves volunteered that he had $85 in a duffel bag in his room. When asked whether he had any scales, the defendant said he did not. Upon searching the bedroom, Steil discovered a duffle bag with $85 in it, a digital scale, and a box with a very small amount of marijuana in it. Clothes were strewn around the room, consistent with someone living there.

Steil said that other officers searching two bedrooms in the upper level of the house found rolled up aluminum foil. He testified the foil was significant because drug manufacturers use it to cover windows to keep light out when drying marijuana. Steil also testified the scale found in the main floor bedroom was of a type used to weigh marijuana.

Although Steil said he thought he had discovered an active marijuana sales operation, on cross-examination he acknowledged that he had not found the type of lighting typically used for growing marijuana, had not found any packaging that appeared to be used for selling marijuana, and had not found any packaged product. Steil also admitted he had not videotaped his conversation with Graves at the police station, even though the equipment to do so was available; he explained he did not have a tape.

Over the defendant's objection, the prosecution was allowed to introduce into evidence the officer's report to rebut the implication that the officer had not documented his conversation with Graves. Steil had prepared the report within a day or two of Graves' arrest. The narrative portion of the report was substantially the same as Steil's testimony.

Upon completion of Steil's testimony, Graves testified on his own behalf. He said he did not live with Quick but had simply stored some of his personal belongings in the first floor bedroom when he moved out of his apartment in the fall of 2001. Graves testified he stayed overnight at Quick's house only occasionally between August 2001 and the date of Steil's search. According to Graves, he primarily slept at another friend's apartment. Graves asserted he had no access to Quick's basement, but did keep a Sony Playstation in the living room of the residence.

Graves confirmed his arrest by Officer Steil on October 6, 2001. He said that an hour or so after he was taken to the jail,

Steil arrived and informed the defendant that he—Steil—had found marijuana at Quick's residence. According to Graves, he—Graves—denied that he had a bedroom at Quick's house; Graves told the officer that he only had some property stored in a room there. The defendant testified that when Steil asked to search Graves' "properties," Graves consented so long as Graves could go along.

The defendant testified that he had no knowledge of the shoebox or scales found in the bedroom. He said the $85 was his money, wages from his employment. He testified he had cash because he did not have a checking account. Graves also contradicted Steil's testimony concerning the marijuana stalks in the basement. Graves testified that when Steil questioned him about this marijuana, he told Steil what Quick had said about finding the marijuana in a ditch. Graves said he did not participate in picking or transporting the stalks of marijuana and denied he had ever admitted any involvement to Steil. The defendant also denied any participation in the manufacture, preparation, or sale of marijuana. He testified, "I had nothing to do with it."

The State called the jail administrator as a rebuttal witness. This witness laid a foundation for admission of the booking records for Graves' October 2001 arrest, which showed Quick's residence as Graves' address. The jailor testified that normally address information comes from the arrested person, but he had no personal knowledge whether the usual procedure was followed in booking Graves. Graves then testified that he had not given Quick's address as his residence when he was admitted to the jail in October 2001.

The jury found the defendant guilty of manufacturing marijuana and of possession of marijuana, a lesser-included offense of the possession-with-intent-to-deliver

charge. Graves' posttrial motions were overruled and the court sentenced him to an indeterminate ten-year term in prison on the manufacturing conviction and imposed statutory fines on both convictions. The defendant then filed this appeal.

II. *Claim on Appeal.*

Graves asserts that alleged misconduct by the county attorney deprived him of a fair trial. *See DeVoss v. State,* 648 N.W.2d 56, 64 (Iowa 2002) (stating prosecutorial misconduct that denies the defendant a fair trial is a violation of due process); U.S. Const. amend. 14. He points to certain questions asked by the county attorney in cross-examining Graves and to statements made by the county attorney in closing argument as the basis for his claim of prosecutorial misconduct.

The following colloquy occurred during the county attorney's cross-examination of Graves with respect to the conversation between Graves and Steil at the police station:

> Q. Then later Officer Steil came back to the jail and advised you of your Miranda rights? A. Yes.
>
> . . . .
>
> Q. You also told him at that time that you and [Quick] had found the marijuana plant near Oskaloosa? A. No.
>
> Q. *Officer Steil made that up?* A. I suppose.
>
> Q. You also told him you and Mr. [Quick] tied the stalks together? A. No, I didn't.
>
> Q. *Officer Steil made that up?* A. I suppose so.
>
> Q. That the marijuana had been put in the basement to dry. Didn't you tell Officer Steil that? A. No.
>
> Q. *He made that up?* A. He told me that's where he found it out. [Quick]

told me it was in the basement so I knew that, too.

(Emphasis added.) Although defense counsel did not object to this questioning, the defendant now claims it was improper for the State to force him to comment on the veracity of another witness.

The defendant also complains on appeal of the following remarks made by the county attorney in the rebuttal portion of his closing argument:

[Defense counsel] talks about the fact Mr. Graves' confession statements were not videotaped, then we have got to ignore them.... I wish it was videotaped, we wouldn't have the problem of *Mr. Graves coming into Court and lying like he did.* It was a very brief conversation done spur of the moment. He was not a focus at the time the officer went to jail only relying on the statements of [Quick].[1]

....

... The defendant expects you to believe that he didn't live there, but that's where he leaves cash lay. *Well, I want you to know I don't carry cash but I don't leave it at other people's house,* especially if it's a flop house, as Mr. Anderson [defense counsel] would tell you, where people come in and out. You are not going to leave $85 in cash laying there. It doesn't matter what Mr. Anderson told you. I want you to think about this.

Why did Defendant deem it necessary *to lie to you* about his residence? The answer is obvious....

....

... He did live in the house, and he's telling you he's responsible because *he's lying to you about not living in the house ....*

....

Look at the evidence, folks. When you look at it and say to yourself *why does this young man sit there and lie to us the way he did.* The reason he did that is because *he's guilty and he knows it,* and after you have looked at the evidence, you know it, too. It can't be just a coincidence that all of these things fell into place, that [Quick] said he lived there, he told Steil he lived there, he told the jailer he lived there. Three months later he said, "I didn't live there. I lived somewhere else." He has cash at his residence but denies it's his. All of these things jump out at you loud and clear. *We are not looking at anything other than that evidence of showing who is lying in this case.* He said he didn't.

One of the instructions tells you to determine who is telling the truth. You look at the stake the person has in the proceedings.... *Mr. Graves' reason for lying is to save himself from conviction. He was not telling the truth on that day ....*

(Emphasis added.) Defense counsel made no objection to the prosecutor's closing argument. Graves now asserts the county attorney improperly belittled him and inappropriately expressed or implied the prosecutor's personal opinion on the credibility of the witnesses and the defendant's guilt.

Because objection was not made at trial, Graves' claim of prosecutorial misconduct is raised on appeal in the context of an ineffective-assistance-of-counsel claim. *See Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674, 693 (1984) (holding Sixth Amendment

---

1. This statement by the county attorney was incorrect based on Officer Steil's decision to give Graves *Miranda* warnings prior to interviewing him at the police station. Obviously, Graves had become a focus of the investigation by this time.

guarantees the effective assistance of counsel to ensure criminal defendants receive a fair trial). Therefore, we first briefly review the components of an ineffective-assistance claim, then discuss the law governing a claim of prosecutorial misconduct, and finally outline the framework for our consideration of these claims.

III. *Applicable Legal Principles and Analytical Framework.*

██ A. *Ineffective-assistance-of-counsel claims.* Two elements must be established to show the ineffectiveness of defense counsel: (1) trial counsel failed to perform an essential duty; and (2) this omission resulted in prejudice. *State v. Greene,* 592 N.W.2d 24, 29 (Iowa 1999). A defendant's inability to prove either element is fatal. *In re Interest of C.M.,* 652 N.W.2d 204, 207 (Iowa 2002).

██ "Generally, ineffective-assistance claims are preserved for postconviction relief proceedings to afford the defendant an evidentiary hearing and thereby permit the development of a more complete record." *State v. Reynolds,* —— N.W.2d ——, ——, 2003 WL 21659144, *4 (Iowa 2003). If the record on appeal shows, however, that the defendant cannot prevail on such a claim as a matter of law, we will "affirm the defendant's conviction without preserving the ineffective-assistance-of-counsel claims." *Id.* Conversely, if the record on appeal establishes both elements of an ineffective-assistance claim and an evidentiary hearing would not alter this conclusion, we will reverse the defendant's conviction and remand for a new trial. *See State v. Allison,* 576 N.W.2d 371, 374 (Iowa 1998). We turn now to the law applicable to claims of prosecutorial misconduct.

██ B. *Due process violation based on prosecutorial misconduct.* The initial requirement for a due process claim based on prosecutorial misconduct is proof of misconduct. *State v. Piper,* 663 N.W.2d 894, 913 (Iowa 2003). Evidence of the prosecutor's bad faith is not necessary, as a trial can be unfair to the defendant even when the prosecutor has acted in good faith. *State v. Leuty,* 247 Iowa 251, 258, 73 N.W.2d 64, 69 (1955).

██ The second required element is proof the misconduct resulted in prejudice to such an extent that the defendant was denied a fair trial. *Piper,* 663 N.W.2d at 913. "Thus, it is the prejudice resulting from misconduct, not the misconduct itself, that entitles a defendant to a new trial." *Id.* In determining prejudice the court looks at several factors "within the context of the entire trial." *Id.* We consider (1) the severity and pervasiveness of the misconduct, *State v. Webb,* 244 N.W.2d 332, 333 (Iowa 1976); (2) the significance of the misconduct to the central issues in the case, *see Piper,* 663 N.W.2d at 903, 913; (3) the strength of the State's evidence, *Greene,* 592 N.W.2d at 32; (4) the use of cautionary instructions or other curative measures, *State v. Anderson,* 448 N.W.2d 32, 33 (Iowa 1989); and (5) the extent to which the defense invited the misconduct, *State v. Swartz,* 601 N.W.2d 348, 353 (Iowa 1999).

C. *Analytical framework.* In analyzing the defendant's ineffective-assistance-of-counsel claim, our first step is to assess whether the record demonstrates, as a matter of law, the existence or absence of a meritorious due process violation. Thus, we must consider whether the prosecutor was guilty of misconduct in the particulars identified by Graves and whether the record shows Graves was prejudiced, i.e., denied a fair trial.

If the record is insufficient to make this determination, we must preserve the defendant's ineffective-assistance claim for a fuller development of the pertinent facts.

If, however, the record shows that either element is lacking as a matter of law, we will affirm Graves' conviction without preserving his due process claim for a later postconviction relief action. Finally, if both elements of Graves' due process claim are established as a matter of law, Graves will have proved that the assertion of such a claim at the time of the prosecutor's misconduct would have had merit.

If it is determined that defense counsel failed to raise a meritorious issue, we must then consider whether an attorney performing within the range of normal competency would have made an objection and/or requested a mistrial. If there is no possibility that trial counsel's failure to act can be attributed to reasonable trial strategy, then we can conclude the defendant has established that counsel failed to perform an essential duty. If trial counsel's conduct might be characterized as a reasonable trial tactic, then Graves' ineffective-assistance claim must be preserved for trial in a possible postconviction relief action.

The final step of our analysis, should the defendant's claim survive to this point, will be to assess whether the record permits a determination of the prejudice prong of the ineffective-assistance claim. In this regard, we will examine whether there is a reasonable probability the outcome of the trial would have been different had trial counsel performed competently.

IV. *Due Process Claim: Existence of Misconduct.*

■ To assess whether the county attorney's action in this case constitutes misconduct, it is necessary first to understand the nature of the role played by the prosecutor in a criminal trial. A prosecutor "is not an advocate in the ordinary meaning of the term." 63C Am.Jur.2d *Prosecuting Attorneys* § 1, at 114 (1997). That is because a prosecutor owes a duty to the defendant as well as to the public. *See State v. Iowa Dist. Ct.,* 568 N.W.2d 505, 508 (Iowa 1997) (stating "a county attorney owes a duty to do justice, not only for the accusers, but also for the accused"); *Webb,* 244 N.W.2d at 333 (stating "[p]rosecutors have a dual function"); *State v. Tolson,* 248 Iowa 733, 734–35, 82 N.W.2d 105–06 (1957) (noting prosecutor owes a duty to the public and to the accused).

■ The prosecutor's duty to the accused is to "assure the defendant a fair trial" by complying with "the requirements of due process throughout the trial." *De-Voss,* 648 N.W.2d at 64; *accord Tolson,* 248 Iowa at 734, 82 N.W.2d at 106. Thus, while a prosecutor is properly an advocate for the State within the bounds of the law, the prosecutor's primary interest should be to see that justice is done, not to obtain a conviction. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935); *State v. Levy,* 160 N.W.2d 460, 467 (Iowa 1968); 63C Am. Jur.2d *Prosecuting Attorneys* § 23, at 135–36 ("It is as much the prosecutor's duty to see that a person on trial is not deprived of any of his or her statutory or constitutional rights as it is to prosecute the defendant."); *ABA Standards for Criminal Justice* 3–1.2(b), (c) (3d ed.1993) (stating the prosecutor is an advocate, but "[t]he duty of the prosecutor is to seek justice, not merely to convict"). An observation we made many years ago is unfortunately still true today: even though prosecutors should keep in mind their obligation to the accused at every stage of the proceeding, too often, they do not. *Tolson,* 248 Iowa at 735, 82 N.W.2d at 106; *see, e.g., State v. Pace,* 602 N.W.2d 764, 767, 774 (Iowa 1999) (prosecutor asked questions in violation of pretrial order); *State v. Rutledge,* 600 N.W.2d 324, 325 (Iowa 1999) (prosecutor made disparaging comments concerning defendant's alibi wit-

nesses in closing argument); *Greene,* 592 N.W.2d at 32 (prosecutor misrepresented witness's testimony in closing argument); *State v. Williams,* 525 N.W.2d 847, 850 (Iowa 1994) (prosecutor improperly pointed a gun at a juror during a demonstration); *State v. Fox,* 491 N.W.2d 527, 532 (Iowa 1992) (county attorney improperly intimidated defense witness). We turn now to the conduct at issue in this case.

■ A. *Prosecutor's cross-examination of the defendant concerning the police officer's truthfulness.* Courts that have considered the propriety of questioning a defendant about the truthfulness of other witnesses have reached divergent conclusions. *See State v. Bayles,* 551 N.W.2d 600, 610 (Iowa 1996) (noting split of authority, but declining to reach issue). Nonetheless, a majority of jurisdictions considers such questioning improper. *See, e.g., United States v. Sanchez,* 176 F.3d 1214, 1220 (9th Cir.1999); *United States v. Boyd,* 54 F.3d 868, 871 (D.C.Cir.1995); *United States v. Akitoye,* 923 F.2d 221, 224 (1st Cir.1991); *United States v. Richter,* 826 F.2d 206, 208 (2d Cir.1987); *State v. Singh,* 259 Conn. 693, 793 A.2d 226, 236 (2002); *Scott v. United States,* 619 A.2d 917, 924–25 (D.C.Ct.App.1993); *State v. Flanagan,* 111 N.M. 93, 801 P.2d 675, 679 (Ct.App.1990); *State v. Emmett,* 839 P.2d 781, 787 (Utah 1992); *State v. Casteneda–Perez,* 61 Wash.App. 354, 810 P.2d 74, 79 (1991); *Beaugureau v. State,* 56 P.3d 626, 635–36 (Wyo.2002). Several reasons underlie this position:

> First, it is well established that "determinations of credibility are for the jury, and not for witnesses." Consequently, questions that ask a defendant to comment on another witness'[s] veracity invade the province of the jury. Moreover, "[a]s a general rule, [such] questions have no probative value and are improper and argumentative be-cause they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence."

Second, questions of this sort also create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied. This risk is especially acute when the witness is a government agent in a criminal case. A witness'[s] testimony, however, "can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved[,]" such as "misrecollection, failure of recollection or other innocent reason."

Similarly, courts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied. The reason for this restriction is that "[t]his form of argument ... involves a distortion of the government's burden of proof." Moreover, like the problem inherent in asking a defendant to comment on the veracity of another witness, such arguments preclude the possibility that the witness' testimony conflicts with that of the defendant for a reason other than deceit.

*Singh,* 793 A.2d at 236–38 (citations omitted).

Some courts, while holding that questioning the accused as to another witness's truthfulness is generally improper, recognize an exception. These courts allow such questioning when the contradiction between the defendant's testimony and that of another witness cannot be attributed to differences in perception or inaccuracies in memory, but rather can only be explained by the conclusion that someone is lying. *See, e.g., State v. Morales,* 198 Ariz. 372, 10 P.3d 630, 633–34 (Ct.App. 2000); *State v. Pilot,* 595 N.W.2d 511, 518

(Minn.1999); *State v. Hart*, 303 Mont. 71, 15 P.3d 917, 924 (2001); *People v. Overlee*, 236 A.D.2d 133, 666 N.Y.S.2d 572, 575–76 (1997). These courts reason that where "the defendant has created a credibility contest," a prosecutor has the right to "cross-examine a defendant as vigorously as possible." *Overlee*, 666 N.Y.S.2d at 577; *accord Pilot*, 595 N.W.2d at 517–18.

At least two courts have held that asking the defendant whether another witness is lying is proper, apparently under any circumstances. *See Dorsey v. State*, 259 Ga. 809, 387 S.E.2d 889, 890 (1990); *Fisher v. State*, 128 Md.App. 79, 736 A.2d 1125, 1163 (Ct.Spec.App.1999). The Georgia court gave no explanation for its holding, but the Maryland court had this to say about its conclusion that asking the defendant whether another witness was lying and then whether "all these people [were] lying" was not objectionable:

> Regardless of what literal words were spoken, [the defendant] was not being asked to assess the credibility of those who had given different accounts of events. The only credibility in issue was her own. What [the defendant] was being asked to do was either 1) to acknowledge her own falsity or 2) to look foolish in denying it. Once the final rhetorical question "So all these people are lying but [you]?" was asked, the skillful cross-examiner would have been turning and walking disdainfully away without waiting for an answer. The answer no longer mattered.

*Fisher*, 736 A.2d at 1163. We disagree with this reasoning. It is inaccurate to say that only the defendant's credibility is at issue; the credibility of *all* witnesses is at issue. Moreover, contrary to the Maryland court's conclusion, a defendant who is asked whether another person lied is commenting directly on the other person's credibility.

The issue then is whether any purpose is served in asking a defendant whether another witness is lying. We think the predominate, if not sole, purpose of such questioning is simply to make the defendant look bad, as implied by the Maryland court's observation in *Fisher* that the accused's answer is unimportant. *See id.* The accused's answer is unimportant because the accused is in a no-win situation. If the defendant says the other witness *is* lying, then the defendant is put in the position of calling someone a liar, a particularly unenviable state when the other witness is a law enforcement officer. *See Emmett*, 839 P.2d at 787 (holding such questions are improper because they put "the defendant in the untenable position of commenting on the character and motivations of another witness who may appear sympathetic to the jury"). If the defendant says a contradictory witness is *not* lying, then a fair inference is that the *defendant* is lying.

But, as any trial lawyer knows, there may be many explanations for differing descriptions of the same event. People have different perceptions of the same conversation that affect how and what they remember. Perhaps there was a misunderstanding of what was said; perhaps one person was distracted and did not fully or correctly hear the words uttered by the other person. People sometimes hear what they want to hear. It is unjust to make the defendant give an opinion as to who is lying when, in fact, it is possible that neither witness has deliberately misrepresented the truth.[2] It is also unrea-

---

2. The possibility that neither witness is lying even though their testimony conflicts is present here. Steil testified Graves told Steil that

Graves and Quick found the marijuana plant and took it back to the house to dry. Graves does not deny such a conversation took place;

sonable to expect the defendant to sift through the variables of human communication to offer an alternative explanation for contradictions in witnesses' testimony.

■ We also think the use of this tactic—asking the defendant whether another witness is lying—is incompatible with the duties of a prosecutor. Unfairly questioning the defendant simply to make the defendant look bad in front of the jury regardless of the answer given is not consistent with the prosecutor's primary obligation to seek justice, not simply a conviction. Nor is such questioning consistent with the prosecutor's duty to the defendant to ensure a fair trial, including a verdict that rests on the evidence and not on passion or prejudice.[3] *Casteneda–Perez,* 810 P.2d at 79 (holding prosecutor's questions asking witnesses whether other witnesses were lying was "contrary to the duty of prosecutors, which is to seek convictions based only on probative evidence and sound reason").

■ For the reasons discussed, we find more persuasive the rationale of those courts that have held it is improper to ask the defendant whether another witness has lied. We also decline to recognize an exception to this rule as a handful of courts have done. The underlying rationale of those courts recognizing an exception is that the defendant has opened the door by contradicting testimony of government witnesses "in circumstances that exclude

the possibility that the prosecution's witnesses may have been mistaken or [may have] testified to events based on assumptions or faulty memory." *Overlee,* 666 N.Y.S.2d at 577; *accord Morales,* 10 P.3d at 633; *Pilot,* 595 N.W.2d at 518. We think, however, that whether the defendant has invited the questioning is more properly considered in assessing the prejudice element of a due process claim.

■ First of all, the justification for admitting this evidence—that the defendant has opened the .door—does not resolve the fundamental doubt as to the probative value of such questioning. *See, e.g., Flanagan,* 801 P.2d at 679 ("Whether the defendant believes the other witnesses were truthful or lying is simply irrelevant."); *People v. Berrios,* 298 A.D.2d 597, 750 N.Y.S.2d 302, 302 (2002) (" 'Whether the defendant believed that the other witnesses were lying is irrelevant.' " (Citation omitted.)). Secondly, the exception depends on a difficult determination—whether alternative explanations exist for discrepancies in the witnesses' testimony, a decision that more properly rests with the jury. Finally, prosecutors and trial judges will have more guidance in assuring proper examination of witnesses with a bright-line rule that bars such inquiries without exception. For these reasons, we hold "were-they-lying" questions are improper under any circumstance. *See Singh,* 793 A.2d at 238–39 (rejecting exception).

---

he simply contends he was describing what Quick *told* him, not what he—Graves—had done. It is conceivable that both witnesses testified truthfully concerning their recollection of the conversation; they simply miscommunicated for any number of innocent reasons.

3. The case before us aptly illustrates these considerations. The prosecutor's questioning of Graves concerning Steil's veracity was designed to coax Graves into accusing the offi-

cer of lying. Based on this questioning, the prosecutor told the jury in closing argument that Graves had in effect called Steil a liar. The only possible reason to characterize Graves' testimony in this manner was to make the jury mad at Graves for accusing a police officer of fabricating testimony. This tactic diverts the jury from its proper focus on whether the relevant evidence establishes the elements of the crimes charged. For this reason, such conduct is inconsistent with the prosecutor's proper role.

Applying this rule here, we conclude the county attorney's questioning was clearly improper. Before we consider whether this misconduct deprived the defendant of a fair trial, however, we discuss the other allegation of prosecutorial misconduct lodged by the defendant.

■ B. *Prosecutor's statements in closing argument that defendant lied.* As set out in detail above, the prosecutor made repeated references in his rebuttal argument to the defendant's lying. Graves asserts the prosecutor improperly expressed his personal opinion on the defendant's credibility and guilt and improperly disparaged the defendant's character.

■ A prosecutor "is entitled to some latitude during closing argument in analyzing the evidence admitted in the trial." *State v. Phillips,* 226 N.W.2d 16, 19 (Iowa 1975). Moreover, a prosecutor may argue the reasonable inferences and conclusions to be drawn from the evidence. *Id.* A prosecutor may not, however, express his or her personal beliefs. *Id.*

The key point is that counsel is precluded from using argument to vouch personally as to a defendant's guilt or a witness's credibility. This is true whether the personal belief is purportedly based on knowledge of facts not possessed by the jury, counsel's experience in similar cases, or any ground other than the weight of the evidence in the trial. A defendant is entitled to have the case decided solely on the evidence.

*State v. Williams,* 334 N.W.2d 742, 744 (Iowa 1983); *accord State v. Martens,* 521 N.W.2d 768, 772 (Iowa Ct.App.1994) (stating, "vouching for a witness may induce the jury to trust the judgment of the prosecutor rather than their view of the evidence since the prosecutor's opinion carries the imprimatur of the Government"); *Beaugureau,* 56 P.3d at 632 (observing

that when a prosecutor asserts his personal opinions, "the jury might be persuaded not by the evidence, but rather by a perception that counsel's opinions are correct because of his position as prosecutor"). As this court noted in *Williams,* this principle is embodied in our code of professional responsibility and in the standards governing the prosecution function. *Williams,* 334 N.W.2d at 744–45; *see also* Iowa Code of Prof'l Responsibility for Lawyers DR 7–106(C)(4); *ABA Standards for Criminal Justice* 3–5.8(b) (3d ed.1993).

■ A prosecutor's duty extends beyond confining his or her arguments to the evidence. In addition, the prosecutor is not "allowed to make inflammatory or prejudicial statements regarding a defendant in a criminal action." *State v. Leiss,* 258 Iowa 787, 792, 140 N.W.2d 172, 175 (1966); *accord State v. Brewster,* 208 Iowa 122, 127, 222 N.W. 6, 8 (1928) ("Prosecutors should refrain from heaping unnecessary abuse upon the defendant."); *see also State v. Wright,* 192 Iowa 239, 245, 182 N.W. 385, 388 (1921) (stating prosecutor's argument must be "kept free of undue denunciations or inflammatory utterances"); *ABA Standards for Criminal Justice* 3–5.8(c) (stating prosecutor's argument should not be "calculated to appeal to the prejudices of the jury").

Based on these principles, the following questions must be answered to determine whether the prosecutor's remarks made in the case before us were proper: (1) Could one legitimately infer from the evidence that the defendant lied? (2) Were the prosecutor's statements that the defendant lied conveyed to the jury as the prosecutor's personal opinion of the defendant's credibility, or was such argument related to specific evidence that tended to show the defendant had been untruthful? and (3) Was the argument made in a professional

manner, or did it unfairly disparage the defendant and tend to cause the jury to decide the case based on emotion rather than upon a dispassionate review of the evidence? We discuss each query in order.

■ We think a fair inference from the divergent testimony of Graves and Steil was that Graves lied about his conversations with the officer, an inference supported as well by Graves' interest in avoiding conviction. Therefore, the prosecutor's comments on the defendant's lies or lying were legitimate inferences from the evidence. *Beaugureau,* 56 P.3d at 633 (holding prosecutor's statement that the defendant lied was a reasonable inference from the express contradictory testimony of the witnesses). We also conclude these comments were generally made in the context of references to the evidence and not as an expression of the prosecutor's personal opinion. At one point the prosecutor cited specific evidence that supported a conclusion the defendant had lied and he encouraged the jury to look at this evidence. Although the prosecutor might have chosen his words more carefully, we do not think he clearly expressed a personal opinion that the defendant was lying. *See United States v. Smith,* 982 F.2d 681, 683, 685 (1st Cir.1993) (rejecting argument that prosecutor's statements in closing argument that defendant and his witness were lying were improper because the context of the statements "suggested inferences the jury might draw from the evidence").

■ On the other hand, the prosecutor personally vouched against the credibility of Graves' testimony that he did not live at Quick's house when the prosecutor asserted that he—the prosecutor—did not leave his cash "at other people's house." This irrelevant fact was outside the record in this case and improper. *See Williams,* 334 N.W.2d at 745 (stating prosecutor may not vouch personally as to a witness's credibility, but rejecting claim of misconduct because the prosecutor "did not in any statement insinuate that his opinion was based on non-record facts nor can it fairly be said that he personally vouched against the credibility of defendant's testimony").

That leads us to another troubling aspect of the prosecutor's closing argument: notwithstanding adequate support in the record for a finding that the defendant lied, did the prosecutor unfairly disparage the defendant in an effort to inflame the passions of the jury? Some courts have held it is misconduct to accuse the defendant of lying or to call the defendant a liar; others have held it is not. *Compare United States v. Drummond,* 481 F.2d 62, 63–64 (2d Cir.1973) (holding that characterization of the accused's defense as "preposterous" and calling the defendant and his witnesses "liars" was misconduct); *Williams v. State,* 803 A.2d 927, 930 (Del. 2002) (holding prosecutor's remarks characterizing the defendant as lying were "patently improper"); *State v. Davis,* 275 Kan. 107, 61 P.3d 701, 710 (2003) ("It is improper for a prosecutor to accuse a defendant of lying."); *People v. Skinner,* 298 A.D.2d 625, 747 N.Y.S.2d 857, 858–59 (2002) (holding prosecutor's repeated "references to defendant being a liar" and characterization of defendant's expert "as a puppeteer with defendant as his puppet" was misconduct), *with People v. Boyette,* 29 Cal.4th 381, 127 Cal.Rptr.2d 544, 58 P.3d 391, 433 (2002) (holding prosecutor's repeated references to the defendant as a liar "was a permissible argument"); *Lugo v. State,* 845 So.2d 74, 107–08 (Fla.2003) (holding prosecutor's statements that defendant was a liar were "appropriate comments on the evidence"); *State v. Cordeiro,* 99 Hawai'i 390, 56 P.3d 692, 727 (2002) (holding not improper to argue defendant

and his witnesses were lying so long as comments did not suggest statements were prosecutor's personal views); *Commonwealth v. Coren,* 437 Mass. 723, 774 N.E.2d 623, 631 n. 9 (2002) (holding prosecutor may call the defendant a "liar" so long as the evidence supports this inference and the comments do not indicate prosecutor's own opinion); *see also Smith,* 982 F.2d at 684 n. 3 (government conceded that it impermissibly used pejorative language in repeatedly characterizing the testimony of the defendant and his witness as lies). A review of this court's prior cases reveals Iowa has joined those jurisdictions holding it improper to call the defendant a liar.

In a 1966 case, this court "frowned upon" statements by the prosecutor that the defendant was a "liar" and a "crook." *Leiss,* 258 Iowa at 792, 140 N.W.2d at 175. Although we did not label such argument improper, we examined the propriety of the prosecutor's comments in the context of the entire record and the contested issues in the case, concluding sufficient prejudice had not been shown to warrant a new trial. *Id.* More recently, however, we condemned similar statements by a prosecutor, finding them "clearly improper." *Rutledge,* 600 N.W.2d at 325. In *Rutledge,* the prosecutor not only characterized the defense witnesses as "liars" and "druggees," but also stated that these witnesses "can't tell the truth," "couldn't be candid with you if they tried," "outright lied ... through their teeth," and "would lie to save their own hides." *Id.* at 325–26 (holding prosecutor's attack on defense witnesses "was plainly out of bounds").

■ We conclude from these cases that Iowa follows the rule that it is improper for a prosecutor to call the defendant a liar, to state the defendant is lying, or to make similar disparaging comments. Notwithstanding this prohibition, a prosecutor is still free "to craft an argument that

includes reasonable inferences based on the evidence and ... when a case turns on which of two conflicting stories is true, [to argue that] certain testimony is not believable." *Davis,* 61 P.3d at 710–11. The county attorney here did not, however, limit his argument to a discussion of whose testimony was most believable based on reasonable inferences from the evidence; rather, he improperly resorted to inflammatory characterizations of the defendant's testimony. *See Williams,* 803 A.2d at 930 (stating "prosecutor's continued characterization of [defendant] as 'lying' was both inflammatory and improper"). These improper characterizations included the prosecutor's assertion that Graves had virtually called Officer Steil a liar. *See State v. Barrow,* 60 Wash.App. 869, 809 P.2d 209, 213 (1991) (stating prosecutor's argument that the defendant "in essence called the police witnesses liars" was misconduct).

■ As noted earlier, prosecutorial misconduct does not automatically prejudice a defendant's right to a fair trial. Thus, we now turn to the prejudice prong of Graves' due process claim to determine whether the prosecutor's improper cross-examination of the defendant and his improper closing argument deprived the defendant of a fair trial.

V. *Due Process Claim: Existence of Prejudice.*

■ To show a denial of due process, the defendant must establish the prosecutor's misconduct deprived the defendant of a fair trial. There are many components of a fair trial. *See generally* 21A Am.Jur.2d *Criminal Law* § 998, at 259–60 (1998). The aspect of a fair trial implicated in the present case is the accused's right "to have his or her guilt or innocence determined solely on the basis of the evidence introduced at trial." *Id.* at 260. This right is threatened "by any

incident likely to prejudice the jury." 21A Am.Jur.2d *Criminal Law* § 1004, at 265; *accord* 75 Am.Jur.2d *Trial* § 192, at 418 (stating "the very heart of a fair trial embodies a disciplined courtroom where an accused's fate is determined solely through the exercise of calm and informed judgment"). As applied to the present case, we must determine whether there is a reasonable probability the prosecutor's misconduct prejudiced, inflamed or misled the jurors so as to prompt them to convict the defendant for reasons other than the evidence introduced at trial and the law as contained in the court's instructions. In making this determination we consider the factors noted previously: (1) the severity and pervasiveness of the misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other curative measures; and (5) the extent to which the defense invited the misconduct.

A. *Significance of the misconduct to central issues.* The misconduct at issue here centered on the credibility of the defendant and of Officer Steil. Their credibility was a significant issue in this case because the statements purportedly made by the defendant to the police officer were the strongest evidence that tied Graves to the contraband serving as the basis for the State's charges.

Because the defendant was not in exclusive possession of the premises where the marijuana was found nor in exclusive and immediate possession of the place where the contraband was discovered, the State could not rely on an inference of constructive possession based on Graves' alleged residence in Quick's house. *See State v. McDowell,* 622 N.W.2d 305, 308 (Iowa 2001). The only link the State had between Graves and the dried marijuana plant was the statement allegedly made by Graves to Officer Steil that the defendant had assisted Quick in picking the plant and tying it up in the basement to dry. Connecting Graves to the box of marijuana found in the living room was even less direct. The State's case rested on the money and, more importantly, the scales found in the bedroom the State alleged was occupied by Graves, items the State argued were used by Graves in a drug operation. To prove the bedroom—and inferentially the scales—were Graves' the State relied on Steil's testimony that both Quick and Graves had told Steil that the defendant was living in Quick's house and using that bedroom. Thus, the jury's belief in the truth of Steil's testimony concerning his conversation with Graves, and to some extent with Quick, was critical to the State's case, as was the jury's disbelief of Graves' denial that he had made the disputed statements to Steil. We conclude, therefore, the prosecutor's misconduct, directed as it was to the credibility of the defendant and Steil, was extremely significant to the central issues in the case, namely, Graves' participation in the manufacture of marijuana and Graves' possession of marijuana.

B. *Strength of State's evidence.* The State's case in the absence of Steil's testimony concerning Graves' admissions was weak. Without the statements allegedly made by the defendant to Steil, the only facts tending to show Graves played a role in the manufacture or possession of marijuana was the presence of Graves' belongings in Quick's spare bedroom, the evidence tending to show Graves gave Quick's address as Graves' residence to the jailor, and Quick's statement to Steil that Graves was staying with Quick. Even if the jury believed that Graves lived with Quick, this fact was not necessarily convincing proof that the marijuana found in the common areas of the house was Graves' property or that Graves was involved in Quick's illicit

activities. In fact, evidence of Graves' mere proximity to the contraband would not, without more, support his conviction of the charges. *See State v. Atkinson*, 620 N.W.2d 1, 4 (Iowa 2000) (holding physical proximity to contraband "is insufficient in itself to constitute dominion and control"). Thus, the State's case was far from overwhelming.

C. *Use of cautionary instructions or curative measures.* The trial court gave cautionary instructions, but these instructions were only those routinely given in criminal trials. Before opening statements and again before closing arguments, the court orally advised the jury that the comments of the attorneys were not evidence and should not be considered as evidence by the jury. A similar admonition was contained in the written instructions given to the jury by the court. No curative measures directed specifically to the misconduct that occurred here were given, presumably because defense counsel did not object to the prosecutor's cross-examination or closing arguments.

D. *Whether misconduct was invited and pervasiveness and severity of misconduct.* We consider these factors together as they both revolve primarily around the closing arguments made by the prosecutor. To some extent, the defense invited the prosecution's focus on the credibility of the defendant vis-a-vis Steil. In his opening statement to the jury, defense counsel stated:

> You will hear the police story, you will hear the ordinary citizen story. You will have the opportunity to evaluate those two stories. You will have an opportunity to listen to both of those witnesses. You will have an opportunity to use your own common sense in listening to those witnesses and determining what the facts are....
>
> . . . .

... The issues here are going to be how it [the marijuana] got there, whose it was, what its purpose was, and, again, as I have said, and I think this is very, very crucial, you will need to listen to the evidence as provided by Mr. Steil, the evidence provided by Mr. Graves. You will need to compare them. You will need to make your own decision as to what actually did happen and what did not happen.

The first overt reference to lying, however, came in the prosecutor's cross-examination of the defendant. It was during the course of this questioning that the prosecutor asked the defendant repeatedly whether Officer Steil was "making up" what Graves had said at the police station.

The prosecutor subsequently singled out this line of questioning in his closing argument. After reviewing Officer Steil's testimony concerning the defendant's arrest, Steil's search of Quick's house, Steil's conversation with Graves at the police station, and Steil's search of the bedroom upon returning to the residence with Graves, the prosecutor stated:

> Keeping all of this in mind, the Defendant gets on the witness stand and testifies, in effect, that Officer Steil is a liar. He didn't use those words, but he might as well have said it. [The prosecutor then reviews Steil's testimony concerning Graves' admissions.] Defendant denies all of this. He's calling Officer Steil a liar.

The prosecutor made no statements directly disparaging the defendant in his initial argument.

In defense counsel's closing argument, the defendant's attorney mentioned the theme he had first developed in his opening statement:

> The key to this case, in my humble opinion, is Officer Steil's testimony

about the admissions, the statements that he said Mr. Graves told him and his testimony of that, and on the other hand Mr. Graves' testimony of what he said. It seems to me this case revolves around how you determine what actually happened.

This argument was the only direct reference to the conflict in the witnesses' testimony made by defense counsel in closing argument. Importantly, Graves' trial counsel also argued that even if Graves had a room in Quick's house that did not mean Graves was "responsible for everything in the house."

Despite the prosecutor's assertion in his closing argument that Graves had called Steil a liar, defense counsel did not address that issue in his remarks. Graves' counsel did not mention the cross-examination in question, did not call Steil a liar, and did not state that Steil was lying. Defense counsel simply pointed out the circumstances that made the various factual scenarios suggested by the evidence believable and not believable.

In rebuttal, the prosecutor mounted a full attack on the credibility and character of the defendant. He referred to "the problem of Mr. Graves coming into Court and lying like he did." He made five additional references to the defendant's lying and one statement that Graves "was not telling the truth." The prosecutor also asserted that the reason Graves lied was "because he's guilty and he knows it" and "to save himself from conviction." Thus, the objectionable comments by the prosecutor were not isolated, but rather reflected a pattern of misconduct, commencing with the county attorney's cross-examination of the defendant. *See Anderson,* 448 N.W.2d at 34 (" '[P]rejudice results from *persistent* efforts to inject prejudicial matter before the jury.' " (Citation omitted.)).

In addition to the misconduct identified by appellate counsel, we also note other statements made by the prosecutor in his rebuttal argument that exacerbated the situation. *See generally Freeman v. State,* 717 So.2d 105, 106 (Fla.Dist. Ct.App.1998) (stating that comment not by itself prejudicial may still contribute to overall effect of prosecutorial misconduct). First, the county attorney referred to defense counsel's argument that there was no proof the scales were used in a drug operation because there was no residue identified on the scales as a "smoke screen." *See Sanchez,* 176 F.3d at 1225 (stating "prosecutor committed misconduct in ... denigrating the defense as a sham"). He also impermissibly attempted to enhance Steil's credibility. In discussing "who is telling the truth," the prosecutor stated, "Officer Steil's stake is what? His pride. *He's going to have a job whether he wins this case or loses this case. He will continue to work for the Oskaloosa Police Department.*" (Emphasis added.) These comments went beyond any evidence in the case, implying that the prosecutor knew something the jurors did not. *See Boyd,* 54 F.3d at 871 (holding prosecutor improperly vouched for police witnesses when she indicated in closing argument officers would not risk their careers by lying, because this argument relied on evidence not in the record); *Davis v. State,* 663 So.2d 1379, 1381 (Fla.Dist.Ct.App. 1995) (holding prosecutor's argument that police officers had nothing to gain by lying because to do so would put their jobs in jeopardy was impermissible attempt to enhance officers' credibility and was not supported by evidence in the record; court reversed defendant's conviction). Similarly, as we have already discussed, the county attorney improperly vouched personally against the credibility of Graves' testimony.

But perhaps most disturbing is the following statement by the prosecutor in his rebuttal argument: "If you believe Officer Steil, there is no question he [Graves] is guilty as charged." Courts considering such comments have held they are improper because they distort the burden of proof. *United States v. Reed,* 724 F.2d 677, 680 (8th Cir.1984); *United States v. Nwankwo,* 2 F.Supp.2d 765, 769 (D.Md. 1998); *Williams,* 803 A.2d at 930; *Freeman,* 717 So.2d at 106; *see also State v. Bishop,* 387 N.W.2d 554, 563–64 (Iowa 1986) (expressing concern about prosecutorial arguments that shift the burden of proof). In addition, such an argument is a misstatement of the law. *Richter,* 826 F.2d at 209 (holding prosecutor's argument that if FBI agents were telling the truth, then the defendant was guilty "was an improper statement of the law" and "patently misleading"). *See generally* 5 Wayne R. LaFave et al., *Criminal Procedure* § 24.7(e), at 556 (2d ed.1999) (stating "misrepresentations of the law also constitute improper argument"). As the Seventh Circuit court of appeals has observed, even if the jury believes the government witnesses have told the truth, it might still conclude guilt has not been proved beyond a reasonable doubt. *United States v. Vargas,* 583 F.2d 380, 386–87 (7th Cir.1978). "The test for reasonable doubt is not which side is more believable, but whether, taking all of the evidence in the case into consideration, guilt as to every essential element of the charge has been proven beyond a reasonable doubt." *Clewis v. State,* 605 So.2d 974, 975 (Fla.Dist.Ct.App. 1992).

The case before us illustrates these principles. The State had to prove much more than simply that Graves lied about where he lived or that Officer Steil told the truth concerning his conversation with Graves. The prosecution had to establish that Graves participated in the manufacturing process found in the basement and that he possessed the drugs found in the living room. Even though Graves allegedly acknowledged his participation in the marijuana drying operation, he made no admissions concerning the shoebox of marijuana. Steil's only testimony linking Graves to the latter contraband was Graves' purported admission that he lived at Quick's house. Even if the jury believed Steil on this point, Graves' residency alone would not support a guilty verdict on the possession-with-intent-to-deliver charge. *See Atkinson,* 620 N.W.2d at 4 ("A defendant's close physical proximity to contraband, as virtually all authorities agree, is insufficient in itself to constitute dominion and control."). Thus, not only did the county attorney's statement distort the burden of proof, it was unquestionably incorrect. *See Vargas,* 583 F.2d at 386–87 (holding argument that jury would have to find that federal officers lied in order to acquit the defendant was a misstatement of the law and improper).

In summary, the prosecutor's misconduct in this case may not have risen to the level of a due process violation if it had occurred in isolation. But when we consider the prosecutor's improper cross-examination and argument in the context of the entire trial, we conclude the fairness of the trial was compromised. *See Richter,* 826 F.2d at 209 (holding prosecutor's cross-examination compelling defendant to state law enforcement officers lied coupled with prosecutor's argument that if officers were telling the truth, the defendant was guilty "were so prejudicial as to require the granting of a new trial"); *Singh,* 793 A.2d at 246 (finding prejudice where state's evidence "was not particularly strong" and the improper comments "were made both during cross-examination and in closing arguments"). The misconduct related to a critical issue in the case. It was

not isolated, but rather became a central theme of the government's prosecution. Other improper arguments made by the prosecution further diverted the jury's attention from the actual issues in the case, exacerbating the impact of the misconduct challenged on appeal. Because trial counsel did not object, the trial judge took no curative measures and the only cautionary instructions given were those customarily included in criminal cases. The effect of the misconduct cannot be minimized, as the State's case was not strong. Finally, the county attorney's actions cannot be excused on the basis they were invited. Although Graves' counsel identified the police station conversation as a key factor in the jury's determination of the case, defense counsel never implied that the jury's resolution of the conflict in the testimony necessitated a finding that someone had lied. Nor did counsel indicate that resolving this conflict was the only matter to be decided by the jury. In addition, the defendant's attorney did not engage in any name-calling. Consequently, we do not think the defendant's opening statement and closing argument justified the prosecutor's personal vouching, his effort to inflame the jury, and his attempt to have the jury's decision improperly depend solely on whether the jury believed the officer lied.

Having concluded that a due process violation occurred, we now turn to an analysis of Graves' ineffective-assistance-of-counsel claim.

VI. *Ineffective–Assistance–of–Counsel Claim: Failure to Perform an Essential Duty.*

■■■■ A. *General principles.* In order to establish the first prong of an ineffective-assistance claim, the defendant must show that trial counsel's performance was outside the range of normal competency. *DeVoss,* 648 N.W.2d at 64. This task is not an easy one as "there is a strong presumption trial counsel's conduct fell within the wide range of reasonable professional assistance." *Id.* The court measures defense counsel's performance by standards consistent with " 'prevailing professional norms.' " *Ledezma v. State,* 626 N.W.2d 134, 142 (Iowa 2001) (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694).

■■■■ Several principles are important in assessing defense counsel's performance. Trial counsel has no duty to raise an issue that has no merit. *State v. Rice,* 543 N.W.2d 884, 888 (1996). In situations where the merit of a particular issue is not clear from Iowa law, the test "is whether a normally competent attorney would have concluded that the question ... was not worth raising." *State v. Schoelerman,* 315 N.W.2d 67, 72 (Iowa 1982); *accord State v. Westeen,* 591 N.W.2d 203, 210 (Iowa 1999). "Miscalculated trial strategies and mere mistakes in judgment normally do not rise to the level of ineffective assistance of counsel." *Ledezma,* 626 N.W.2d at 143. The fact that a particular decision was made for tactical reasons does not, however, automatically immunize the decision from a Sixth Amendment challenge. *See Kellogg v. Scurr,* 741 F.2d 1099, 1102 (8th Cir.1984). That decision must still satisfy the ultimate test: whether "under the entire record and totality of the circumstances" counsel performed competently. *Osborn v. State,* 573 N.W.2d 917, 922 (Iowa 1998).

■■■■ B. *Application to facts of this case.* As we have already determined, the issues defense counsel is criticized for ignoring have merit: the prosecutor engaged in objectionable conduct and this conduct denied the defendant a fair trial. The question, then, is whether counsel performed competently in failing to object to

the county attorney's questions and argument and in failing to request a mistrial. We could preserve the defendant's ineffective-assistance claim to provide counsel with an opportunity to explain his conduct, but there really are only two plausible explanations: (1) counsel reasonably believed such objections or requests had no merit, or (2) counsel acquiesced in the prosecutor's misconduct as a matter of trial strategy. Regrettably, we think neither explanation is a sufficient excuse for trial counsel's failures.

■■■ Although there has been no Iowa case determining the propriety of asking a defendant to comment on the veracity of another witness, the issue was raised in *Bayles,* where this court noted a split of authority. 551 N.W.2d at 610. In addition, just two years prior to the trial in this matter, this court held that comments similar to those made by the county attorney in this case were "clearly improper." *Rutledge,* 600 N.W.2d at 325 (prosecutor stated defense witnesses "outright lied" and "can't tell the truth"). Given these prior decisions, counsel could not have reasonably concluded that objections to the prosecutor's cross-examination and closing argument were not worth making. Furthermore, we have held that "trial counsel's failure to raise an issue of first impression cannot be excused as a judgment call left to the discretion of trial counsel." *Westeen,* 591 N.W.2d at 210.

The only remaining explanation, then, for trial counsel's failure to challenge the county attorney's conduct is trial strategy. Had the county attorney's improper comments in the present case been an isolated occurrence, we could understand a decision by defense counsel to let them go without objection as a sound trial tactic. When, however, the comments related to a critical issue in the case, were designed to inflame the jurors against the defendant, and were part of an overall plan by the prosecution to inappropriately rest a determination of guilt solely on whether the defendant or a police officer lied, the risk of prejudice was far too great to permit the prosecutor's tactics to continue without objection. Significantly, the county attorney's most egregious argument occurred in his rebuttal. Consequently, defense counsel had no opportunity to minimize any resulting prejudice or to focus the jury on the determinative issues through additional argument. Thus, absent an objection or a request for a mistrial, there was no way to address the prosecutor's misconduct. Under these circumstances, we do not think defense counsel's failure to object to the prosecutor's conduct can be justified as a trial strategy that fell within the range of reasonable professional assistance. This conclusion brings us to the issue of prejudice.

*VII.   Ineffective–Assistance–of–Counsel Claim: Prejudice.*

■■■ "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland,* 466 U.S. at 691–92, 104 S.Ct. at 2067, 80 L.Ed.2d at 696. In order to prove a denial of one's right to counsel, a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. This requirement does not mean a defendant must establish "that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693, 104 S.Ct. at 2068, 80 L.Ed.2d at 697. A defendant need only show that the probability of a different result is "sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. In determining whether this standard has been

met, we must consider the totality of the evidence, what factual findings would have been affected by counsel's errors, and whether the effect was pervasive or isolated and trivial. *Id.* at 695–96, 104 S.Ct. at 2069, 80 L.Ed.2d at 698.

■ We have already discussed at length the prejudice component of Graves' due process claim and much of what was said there is equally applicable here. The misconduct of the county attorney related to a critical issue in the case and was the centerpiece of the prosecution's trial strategy. *See Richter,* 826 F.2d at 209–10 (concluding prosecutor's improper attempts to convince jury that resolution of case depended on whether FBI agents or the defendant lied was prejudicial and warranted new trial). The effect of this misconduct was compounded by the prosecutor's disparagement of defense counsel's argument, by his improper characterization of the defendant's testimony concerning Steil's veracity, by his improper enhancement of the officer's credibility, by his improper personal vouching against the credibility of Graves' testimony, and by the prosecutor's statement to the jury that it had to find the defendant guilty if it believed the police officer's testimony. The evidence of Graves' participation in the manufacture of marijuana and of his ownership of the box of marijuana was not strong. *See Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699 (stating "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). As a result, our confidence that the outcome would be the same in the absence of defense counsel's errors is undermined. Accordingly, Graves has established the prejudice component of his ineffective-assistance claim.

VIII. *Summary and Disposition.*

■ The prosecutor engaged in misconduct when he asked the defendant whether the police officer had "made up" his testimony. Additional misconduct occurred in the prosecutor's closing argument when he accused the defendant of calling the officer a liar and again in the prosecutor's rebuttal argument when he repeatedly characterized the defendant as lying. This misconduct permeated the entire trial because it was part of a theme developed by the prosecutor through the challenged instances of misconduct as well as through the prosecutor's inappropriate reference to the defense argument as a "smoke screen," the prosecutor's improper assertion that the police officer had no motivation to lie because he would keep his job regardless of the outcome of the case, the prosecutor's improper statement that he personally does not leave cash at other people's homes, and the prosecutor's inaccurate declaration that if the jury believed the officer, it would have to find the defendant guilty. When the challenged misconduct is considered in the context of the other improper arguments made by the prosecutor, we conclude the defendant was deprived of a fair trial.

Defense counsel could not reasonably have concluded that objections to the county attorney's conduct were not worth making. In addition, trial counsel's failure to object cannot be attributed to sound trial strategy. Therefore, a determination can be made on the present record that counsel did not perform within a reasonable range of competency. Due to the pervasiveness of the prosecutor's misconduct, its effect on the central issues in the case, and the weakness of the State's evidence in the absence of the tainted testimony, the defendant has shown a reasonable probability that, but for counsel's errors, the result of his trial would have been different.

In conclusion, the defendant has established he received ineffective assistance from his trial counsel. This denial of his Sixth Amendment right to the effective assistance of counsel warrants a new trial. Therefore, we reverse the judgment of conviction and sentence and remand this case for retrial.

**REVERSED AND REMANDED.**

All justices concur except CADY, J., who dissents and LARSON, J., who joins the dissent.

CADY, Justice (dissenting).

I respectfully dissent. I agree with the majority that a prosecutor should not ask a defendant to comment on the veracity of another witness' testimony. However, I disagree with the majority's conclusion that the prosecutor's questions and closing argument in this case resulted in the type of prejudice that justifies a new trial. I would conclude the ineffective assistance claim cannot be established due to the lack of prejudice.

It is instructive to observe that none of the federal case authority used by the majority to support the legal proposition that it is error for a prosecutor to cross-examine a defendant concerning the truthfulness of another witness included a further conclusion that the cross-examination was prejudicial. *See Sanchez,* 176 F.3d at 1220 (unnecessary to determine prejudice due to other error warranting reversal of the conviction); *Boyd,* 54 F.3d at 872 (no prejudice found); *Akitoye,* 923 F.2d at 224 (question was proper when viewed in context of prosecutor's objective); *Richter,* 826 F.2d at 208 (question alone was not prejudicial). Furthermore, it is perhaps even more instructive that the federal case authority used by the majority when pointing out the "most disturbing" prosecutorial error in this case—telling the jury they must find the defendant guilty if they be-lieve the officer's testimony—went on to conclude such error was not prejudicial. *See Reed,* 724 F.2d at 681 (error did not amount to prejudicial error); *Nwankwo,* 2 F.Supp.2d at 769–70 (remark was improper but not prejudicial error).

There are, of course, cases that have found prejudicial error based on the type of prosecutorial misconduct that occurred in this case, but the point is that this type of error frequently does not result in a new trial. The error often is not prejudicial because courts frequently glean from the record that the prosecutor asked the erroneous questions and made the erroneous statements merely as a way to point out the contradiction in the testimony, not to solicit an actual opinion on the credibility of another witness. *See Akitoye,* 923 F.2d at 224–25. Additionally, such questions and statements do not result in prejudice because courts tend to place confidence in the jury and their ability to follow the court's instructions. *See Boyd,* 54 F.3d at 872.

In this case, the questions of the prosecutor, placed in proper context, were not asked merely in an effort to solicit an opinion on the credibility of the police officer. They were asked to point out contradictory testimony and to suggest which witness might have a bias to testify untruthfully. The same is true for the statements made in closing argument, when considered in the context of the entire trial. The jury was presented with a clear conflict between the testimony of the police officer and the testimony of the defendant on an important issue, and the references to lying, although improper, were injected into the trial as an expression of the prosecutor's argument that the defendant did not testify truthfully on this issue. Moreover, the references to lying were used in conjunction with a discussion of the

trial evidence, inferences drawn from the evidence, or the jury instructions. In fact, the prosecutor's discussion of the issue in closing argument was largely from the perspective of "who is lying in this case," and he examined the motives of witnesses other than the defendant to determine if they "would also lie." In this context, the justifications recognized by the majority to support the underlying prohibition are only minimally implicated. *See Akitoye,* 923 F.2d at 224–25.

Furthermore, the trial court in this case instructed the jury that "statements, arguments, questions, and comments by the lawyers" were not evidence and the verdict was required to be based "only upon the evidence." The trial court also properly instructed the jury on the burden of proof, which helps dispel concerns that the prosecutor's "most disturbing" error distorted the State's burden of proof. Additionally, just prior to the start of the closing arguments, the trial court again instructed the jury that the summations to be made by the attorneys should not be "construed by you as evidence," but "are intended to help you in understanding the contentions of each side." The majority discounts these instructions as merely "routine," but routine or not, they exist to deal with the very issue that has generated dispute in this case.

The standard for prejudicial error to support relief requires "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. This standard has not been met in this case. The majority has exaggerated the prosecutorial error in this case by failing to place it in its context, and by overlooking the role of the jury instructions and the jury's ability to follow those instructions. I would admonish that prosecutors refrain from the improper conduct engaged in this case, but I would affirm the conviction.

LARSON, J., joins this dissent.